FRANK S. HEDIN (Pro Hac Vice Application Forthcoming)
ARUN G. RAVINDRAN (Pro Hac Vice Application Forthcoming)
**HEDIN LLP**
1395 Brickell Avenue, Suite 610
Miami, Florida 33131-3302
Telephone:  (305) 357-2107
Facsimile:  (305) 200-8801
E-Mail:      fhedin@hedinllp.com
             aravindran@hedinllp.com


DAVID W. SCOFIELD – 4140
**PETERS | SCOFIELD**
*A Professional Corporation*
7430 Creek Road, Suite 303
Sandy, Utah 84093-6160
Telephone:  (801) 322-2002
Facsimile:  (801) 912-0320
E-Mail:      dws@psplawyers.com

*Attorneys for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| NOVELLA ATWOOD; CHRISTINE CID; CHERALEE ENGLAND; KATHLEEN GAGON; KRISTEN PUERTAS; JANICE RANDALL; and SARAH TYCHSEN, individually and on behalf of all others similarly situated,<br><br>              Plaintiff,<br><br>   v.<br><br>DOTDASH MEDIA, INC. D/B/A DOTDASH MEREDITH,<br><br>          Defendant. | **FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><br>Case No. 1:24-cv-00046<br><br><br>District Judge Tena Campbell<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiff Novella Atwood ("Plaintiff Atwood"), Plaintiff Christine Cid ("Plaintiff Cid"), Plaintiff Cheralee England ("Plaintiff England"), Plaintiff Kathleen Gagon ("Plaintiff Gagon"), Plaintiff Kristen Puertas ("Plaintiff Puertas"), Plaintiff Janice Randall ("Plaintiff Randall"), and Plaintiff Sarah Tychsen ("Plaintiff Tychsen") (collectively, "Plaintiffs"),[1] individually and on behalf of all others similarly situated, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## **INTRODUCTION**

1.      Defendant Dotdash Media, Inc/ d/b/a Dotdash Meredith ("Meredith") rented, sold, and/or otherwise disclosed for compensation detailed information about Plaintiffs' purchases of subscriptions to several Meredith magazines—including their full names, home addresses, the fact that they are Meredith magazine customers, and the products and the dollar amount of the products they purchased (collectively "Private Purchase Information")— to data aggregators, data appenders, data cooperatives, list brokers, political organizations, aggressive direct-mail advertisers, and non-profit organizations.  As a result, Plaintiffs have received a

---

[1] Plaintiffs submit this First Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(B).

barrage of unwanted junk mail.  By renting, selling, and/or otherwise disclosing for compensation Plaintiffs' Private Purchase Information (defined below), without providing Plaintiffs with prior notice of these disclosures, Meredith violated Utah's Notice of Intent to Sell Nonpublic Personal Information Act, Utah Code Ann. § 13-37 (the "NISNPIA").

2.      Documented evidence confirms these facts.  For example, Meredith, through list broker AudienceFirst Media ("AFM"), offers to provide renters access to the "Dotdash Meredith Database – Enhanced Masterfile", which contains the Private Purchase Information of all 7,499,000 of Defendant's recent magazine and book purchasers at a base price of "$115/M [per thousand]," (i.e., 11.5 cents apiece), as shown in the screenshot below:

*[This Space Left Blank Intentionally]*



*See* **Exhibit A** hereto.

3.      Egregiously, Meredith also offers to sell, rent, or exchange lists of all of its customers over 50 years old (broken down by age bracket) and its customers with children (broken down by the children's age), as reflected by the following datacards currently advertised by Meredith on AFM's website:

*[This Space Left Blank Intentionally]*



**Exhibits B-C** hereto.

4.      By renting, selling, or otherwise disclosing for compensation the Private Purchase Information of its customers to third parties, without providing its customers prior notice of such practices, Meredith violated the NISNPIA. Subsection 2 of the NISNPIA provides:

> A commercial entity may not disclose nonpublic personal information that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction if the commercial entity fails to comply with [the provisions requiring that prior notice of such disclosures be provided to the consumer, as set forth in] Section 13-37-201.

Utah Code Ann. § 13-37-202(1).

5.      Accordingly, Plaintiffs bring this First Amended Class Action Complaint against Meredith for its intentional, systematic, and unlawful disclosures of its customers' Private Purchase Information in violation of the NISNPIA.

## NATURE OF THE CASE

6.      To supplement its revenues, Meredith rents and sells (for money), exchanges (for other valuable consumer data), and otherwise discloses for compensation all of its customers' information—including their full names, home addresses, and fact that they are purchasers of Defendant's publications (collectively "Private Purchase Information"), as well as other sensitive personal and demographic information such as their gender, age, income, ethnicity, policital views, lifestyle interests, preferred travel locations, hobbies, reading habits, health and exercise routines, and sports and outdoor interests—to data aggregators, data appenders, data cooperatives, list brokers, political organizations, aggressive direct-mail advertisers, non-profit organizations, and other third parties without the written consent of its customers.

7.      Meredith's disclosure of Private Purchase Information and other individualized information is not only unlawful, but also dangerous because they allow for the targeting of particularly vulnerable members of society.  For example, anyone could rent a customer list from Meredith that contains the names and addresses of all Hispanic women in Utah who are over the age of 60, live in a home

with children between 6 and 12 years old, have an annual income of less than $30,000, and subscribe to *Better Home & Gardens*. Such a list is available for sale on the open market for approximately $176.00 per thousand subscribers listed.

8.     While Meredith profits handsomely from the unauthorized rentals, sales, and/or other compensation-driven disclosures of its customers' Private Purchase Information, it does so at the expense of its customers' statutory privacy rights (afforded by the NISNPIA) because Meredith does not provide any prior notice of such disclosures to its customers (much less obtain their consent) before disclosing their Private Purchase Information to third parties for compensation.

## PARTIES

### I.     Plaintiff Atwood

9.     Plaintiff Atwood is a natural person and a citizen and resident of Salt Lake County in West Valley, Utah.

10.     On or after January 1, 2004, while a resident of and physically present in Utah, Plaintiff Cid purchased subscriptions to several magazines from Meredith, including but not limited to *Travel + Leisure* and *allrecipes Digital*. Such subscriptions were subsequently sent by Defendant to Plaintiff Atwood's address in Utah.

11.     Prior to and at the time Plaintiff Atwood made her purchases, Meredith did not notify Plaintiff Atwood that it rents, sells, exchanges, or otherwise discloses

for compensation its customers' Private Purchase Information to third parties, and Plaintiff Atwood has never authorized Meredith to do so. Furthermore, Plaintiff Atwood was never provided any written notice that Meredith rents, sells, or otherwise discloses for compensation its customers' Private Purchase Information, or any means of opting out.

12.     After such purchases were made, and during the applicable statutory period, Meredith disclosed, without providing Plaintiff Atwood the prior notice required by Utah Code Ann. § 13-37-201, Plaintiff Atwood's Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, list brokers, aggressive advertisers, direct-marketing companies, political organizations, non-profit companies, and other third parties, who then supplemented that information with data from their own files.

13.     Moreover, during that same period, Meredith rented, sold, exchanged, or otherwise disclosed for compensation lists containing Plaintiff Atwood's Private Purchase Information to third parties seeking to contact Meredith's customers for their own independent business purposes.

## II.     Plaintiff Cid

14.     Plaintiff Cid is a natural person and a citizen and resident of Salt Lake County in West Jordan, Utah.

15.     On or after January 1, 2004, while a resident of and physically present

in Utah, Plaintiff Cid purchased subscriptions to several magazines from Meredith, including but not limited to *Travel + Leisure* and *People*. Such subscriptions were subsequently sent by Defendant to Plaintiff Cid's address in Utah.

16.     Prior to and at the time Plaintiff Cid made her purchases, Meredith did not notify Plaintiff Cid that it rents, sells, exchanges, or otherwise discloses for compensation its customers' Private Purchase Information to third parties, and Plaintiff Cid has never authorized Meredith to do so. Furthermore, Plaintiff Cid was never provided any written notice that Meredith rents, sells, or otherwise discloses for compensation its customers' Private Purchase Information, or any means of opting out.

17.     After such purchases were made, and during the applicable statutory period, Meredith disclosed, without providing Plaintiff Cid the prior notice required by Utah Code Ann. § 13-37-201, Plaintiff Cid's Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, list brokers, aggressive advertisers, direct-marketing companies, political organizations, non-profit companies, and other third parties, who then supplemented that information with data from their own files.

18.     Moreover, during that same period, Meredith rented, sold, exchanged, or otherwise disclosed for compensation lists containing Plaintiff Cid's Private Purchase Information to third parties seeking to contact Meredith's customers for

their own independent business purposes.

### III.   Plaintiff England

19.     Plaintiff England is a natural person and a citizen and resident of Carbon County in Sunnyside, Utah.

20.     On or after January 1, 2004, while a resident of and physically present in Utah, Plaintiff England purchased subscriptions to several magazines from Meredith, including but not limited to *Better Homes and Gardens*. Such subscriptions were subsequently sent by Defendant to Plaintiff England's address in Utah.

21.     Prior to and at the time Plaintiff England made her purchases, Meredith did not notify Plaintiff England that it rents, sells, exchanges, or otherwise discloses for compensation its customers' Private Purchase Information to third parties, and Plaintiff England has never authorized Meredith to do so. Furthermore, Plaintiff England was never provided any written notice that Meredith rents, sells, or otherwise discloses for compensation its customers' Private Purchase Information, or any means of opting out.

22.     After such purchases were made, and during the applicable statutory period, Meredith disclosed, without providing Plaintiff England the prior notice required by Utah Code Ann. § 13-37-201, Plaintiff England's Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, list

brokers, aggressive advertisers, direct-marketing companies, political organizations, non-profit companies, and other third parties, who then supplemented that information with data from their own files.

23.    Moreover, during that same period, Meredith rented, sold, exchanged, or otherwise disclosed for compensation lists containing Plaintiff England's Private Purchase Information to third parties seeking to contact Meredith's customers for their own independent business purposes.

## IV.    Plaintiff Gagon

24.    Plaintiff Gagon is a natural person and a citizen and resident of Utah County in American Fork, Utah.

25.    On or after January 1, 2004, while a resident of and physically present in Utah, Plaintiff Gagon purchased subscriptions to several magazines from Meredith, including but not limited to *Better Homes & Gardens* and *Real Simple*. Such subscriptions were subsequently sent by Defendant to Plaintiff Gagon's address in Utah.

26.    Prior to and at the time Plaintiff Gagon made her purchases, Meredith did not notify Plaintiff Gagon that it rents, sells, exchanges, or otherwise discloses for compensation its customers' Private Purchase Information to third parties, and Plaintiff Gagon has never authorized Meredith to do so. Furthermore, Plaintiff Gagon was never provided any written notice that Meredith rents, sells, or otherwise

discloses for compensation its customers' Private Purchase Information, or any means of opting out.

27.     After such purchases were made, and during the applicable statutory period, Meredith disclosed, without providing Plaintiff Gagon the prior notice required by Utah Code Ann. § 13-37-201, Plaintiff Gagon's Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, list brokers, aggressive advertisers, direct-marketing companies, political organizations, non-profit companies, and others, who then supplemented that information with data from their own files.

28.     Moreover, during that same period, Meredith rented, sold, exchanged, or otherwise disclosed for compensation lists containing Plaintiff Gagon's Private Purchase Information to third parties seeking to contact Meredith's customers for their own independent business purposes.

### V.     Plaintiff Puertas

29.     Plaintiff Puertas is a natural person and a citizen and resident of Utah County in Orem, Utah.

30.     On or after January 1, 2004, while a resident of and physically present in Utah, Plaintiff Puertas purchased one or more subscriptions to magazine(s) from Meredith, including but not limited to *Better Homes & Gardens*.  Such subscriptions were subsequently sent by Defendant to Plaintiff Puertas' address in Utah.

31.     Prior to and at the time Plaintiff Puertas made her purchases, Meredith did not notify Plaintiff Puertas that it rents, sells, exchanges, or otherwise discloses for compensation its customers' Private Purchase Information to third parties, and Plaintiff Puertas has never authorized Meredith to do so. Furthermore, Plaintiff Puertas was never provided any written notice that Meredith rents, sells, or otherwise discloses for compensation its customers' Private Purchase Information, or any means of opting out.

32.     After such purchases were made, and during the applicable statutory period, Meredith disclosed, without providing Plaintiff the prior notice required by Utah Code Ann. § 13-37-201, Plaintiff Puertas' Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, list brokers, aggressive advertisers, direct-marketing companies, political organizations, non-profit companies, and others, who then supplemented that information with data from their own files.

33.     Moreover, during that same period, Meredith rented, sold, exchanged, or otherwise disclosed for compensation lists containing Plaintiff Puertas' Private Purchase Information to third parties seeking to contact Meredith's customers for their own independent business purposes.

## VI.   Plaintiff Randall

34.     Plaintiff Randall is a natural person and a citizen and resident of Utah

County in Sarasota Springs, Utah.

35.    On or after January 1, 2004, while a resident of and physically present in Utah, Plaintiff Randall purchased subscriptions to several magazines from Meredith, including but not limited to *Better Homes & Gardens*, *Travel + Leisure,* and *Real Simple*. Such subscriptions were subsequently sent by Defendant to Plaintiff Randall's address in Utah.

36.    Prior to and at the time Plaintiff Randall made her purchases, Meredith did not notify Plaintiff Randall that it rents, sells, exchanges, or otherwise discloses for compensation its customers' Private Purchase Information to third parties, and Plaintiff Randall has never authorized Meredith to do so. Furthermore, Plaintiff Randall was never provided any written notice that Meredith rents, sells, or otherwise discloses for compensation its customers' Private Purchase Information, or any means of opting out.

37.    After such purchases were made, and during the applicable statutory period, Meredith disclosed, without providing Plaintiff Randall the prior notice required by Utah Code Ann. § 13-37-201, Plaintiff Randall's Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, list brokers, aggressive advertisers, direct-marketing companies, political organizations, non-profit companies, and others, who then supplemented that information with data from their own files.

38.     Moreover, during that same period, Meredith rented, sold, exchanged, or otherwise disclosed for compensation lists containing Plaintiff Randall's Private Purchase Information to third parties seeking to contact Meredith's customers for their own independent business purposes.

### VII.   Plaintiff Tychsen

39.     Plaintiff Tychsen is a natural person and a citizen and resident of Summit County in Francis, Utah.

40.     On or after January 1, 2004, while a resident of and physically present in Utah, Plaintiff Tychsen purchased subscriptions to several magazines from Meredith, including but not limited to *Better Homes & Gardens*, *Allrecipes*, and *Real Simple*.   Such subscriptions were subsequently sent by Defendant to Plaintiff Tychsen's address in Utah.

41.     Prior to and at the time Plaintiff Tychsen made her purchases, Meredith did not notify Plaintiff Tychsen that it rents, sells, exchanges, or otherwise discloses for compensation its customers' Private Purchase Information to third parties, and Plaintiff Tychsen has never authorized Meredith to do so. Furthermore, Plaintiff Tychsen was never provided any written notice that Meredith rents, sells, or otherwise discloses for compensation its customers' Private Purchase Information, or any means of opting out.

42.     After such purchases were made, and during the applicable statutory

period, Meredith disclosed, without providing Plaintiff Tychsen the prior notice required by Utah Code Ann. § 13-37-201, Plaintiff Tychsen's Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, list brokers, aggressive advertisers, direct-marketing companies, political organizations, non-profit companies, and others, who then supplemented that information with data from their own files.

43.     Moreover, during that same period, Meredith rented, sold, exchanged, or otherwise disclosed for compensation lists containing Plaintiff Tychsen's Private Purchase Information to third parties seeking to contact Meredith's customers for their own independent business purposes.

### VIII.  Defendant Dotdash Media, Inc. d/b/a Dotdash Meredith

44.     Meredith is the largest digital and print publisher in the United States.

45.     Meredith is a Delaware corporation that maintains its headquarters and principal place of business in New York, New York.

46.     Meredith has one or more office(s) or other place(s) of business in Utah, including but not limited to 1108 E. South Union Ave., Midvale, Utah 84047 (a location overseen by Meredith's registered agent on Meredith's behalf). Additionally, Meredith has employees who work for Meredith from Utah (and thus conduct business on Meredith's behalf at places in Utah).

47.     Meredith does business throughout Utah and the entire United States

and, in the ordinary course of its business, enters into transactions with consumers in Utah.

48.    Meredith is the publisher of numerous magazines, books, and other publications, including but not limited to *Better Homes & Gardens*, *People*, *Country Home*, *Allrecipes*, *Southern Living*, *Real Simple*, *Magnolia Journal*, *Wood*, 25 *Beautiful Homes*, *Ageless Iron*, *American Baby*, *American Patchwork & Quilting*, *Country Life*, *Diabetic Living*, *Do-It-Yourself*, *Eat This, Not That*, *EatingWell*, *Entertainment Weekly*, *Every Day with Rachael Ray*, *FamilyFun*, *Fitness*, *Food & Wine*, *Health*, *InStyle*, *Living the Country Life*, *Midwest Living*, *Parents*, *Practical Boat Owner*, *Shape*, *Siempre Mujer*, *Successful Farming*, and *Travel + Leisure*.

## JURISDICTION AND VENUE

49.    This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

50.    The Court has personal jurisdiction over Meredith because Plaintiffs' claims arose in substantial part from actions and omissions in Utah, including from Plaintiffs' purchases of subscriptions to Defendant's magazines while Plaintiffs resided and were physically present in Utah; Meredith's direction of such consumer

products into Utah; and Meredith's failure to provide to Plaintiffs, in Utah, the notice required by Utah Code Ann. § 13-37-201 before disclosing their Private Purchase Information, including their residential addresses in Utah, to other persons, the effects of which were felt from within Utah by a citizen and resident of Utah. Personal jurisdiction also exists over Meredith in Utah because Meredith is registered to do business in Utah, maintains one or more office(s) or other place(s) of business in Utah (including a location overseen by its registered agent), and conducts substantial business within Utah, such that Meredith has significant, continuous, and pervasive contacts with Utah.

51.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiffs reside in this judicial District, Meredith does substantial business in this judicial District, Meredith is subject to personal jurisdiction in this judicial District, and a substantial part of the events giving rise to Plaintiffs' claims took place within this judicial District.

## FACTUAL BACKGROUND

### *Utah's Notice of Intent to Sell Nonpublic Personal Information Act*

52.     Pursuant to the NISNPIA, "[a] commercial entity may not disclose nonpublic personal information that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction if the commercial entity fails to comply with Section 13-37-201." Utah Code Ann. § 13-37-202.

53.     A "commercial entity" is a person that "has an office or other place of business located in [Utah]" and "in the ordinary course of business transacts a consumer transaction in [Utah]." *Id.* § 13-37-102(2)(a).

54.     "Consumer transaction" means, *inter alia*, "a sale, lease, assignment, award by chance, or other written or oral transfer or disposition . . . of[] goods[,] services[,] or other tangible or intangible property, . . . that is initiated or completed in [Utah]." *Id.* § 13-37-102(4)(a)(i).

55.     "Nonpublic personal information" means "information that . . . is not public information" and, "either alone or in conjunction with public information, identifies a person in distinction from other persons." *Id.* § 13-37-102(5)(a). "Nonpublic personal information" expressly includes, *inter alia*, "the purchasing patterns of a person" or "the personal preferences of a person." *Id.* § 13-37-102(5)(b)(iii)-(iv).

56.     A commercial entity "is considered to have obtained information as a result of a consumer transaction if . . . the person provides the information to the commercial entity . . . at any time during the consumer transaction . . . and at the request of the commercial entity," or if "the commercial entity otherwise obtains the information . . . and but for the consumer transactions, the commercial entity would not obtain the information." *Id.* § 13-37-201(1)(b).

57.     Section 13-37-201 of the NISNPIA requires a commercial entity to

provide the consumer with a notice, in the form set forth in that section, if "the commercial entity enters into a consumer transaction with that person[,]" "as a result of the consumer transaction . . . , the commercial entity obtains nonpublic personal information concerning that person[,] and "the commercial entity intends to or wants the ability to disclose the nonpublic personal information . . . to a third party . . . for compensation," where such compensation "is the primary consideration for the commercial entity disclosing the nonpublic personal information," is "directly related to the commercial entity disclosing the nonpublic personal information," and "is not compensation received by the commercial entity in consideration of a transaction [wherein a third party provides the commercial entity with: "(i) services, including business outsource services; (ii) personal or real property; or (iii) other thing of value"])." *Id.* § 13-37-201(1)(a); § 13-37-201(5).

58.     The notice required by section 13-37-201 of the NISNPIA "shall read substantially as follows: 'We may choose to disclose nonpublic personal information about you, the consumer, to a third party for compensation." *Id.* § 13-37-201(3)(a).  The notice may be provided either "orally, if the consumer transaction itself is entirely conducted orally[,] or . . . in writing, if the notice is written in dark bold." *Id.* § 13-37-201(3)(b).   In either case, the notice "shall be sufficiently conspicuous so that a reasonable person would perceive the notice before providing the nonpublic personal information." *Id.* § 13-37-201(3)(c). The notice "shall be

given before the earlier of . . . the point at which the person is requested to provide the nonpublic personal information[] or . . . the commercial entity otherwise obtains the nonpubllic personal information as a result of the consumer transaction[.]" *Id.* § 13-37-201(2).

59.     The NISNPIA entitles consumers who suffer violations of the statute to recover, *inter alia*, "$500 for each time the commercial entity fails to provide the notice required by this section in relation to the nonpublic personal information of the person who brings the action." *Id.* § 13-37-203.

60.     Despite the fact that Meredith has initiated or completed at least tens of thousands of sales of its products to consumers in Utah, Meredith disregarded its legal responsibility to these individuals by systematically violating the NISNPIA.

### *The Private Information Market: Consumers' Private Information Has Real Value*

61.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[2]

---

[2]     **Exhibit D**, The Information Marketplace:   Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-

62.    More than two decades later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[3]

63.    The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[4]

64.    In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive"

---

marketplace-merging-and-exchanging-consumer-data/transcript.pdf   (last   visited July 30, 2021).

[3]    *See* **Exhibit E**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited July 30, 2021).

[4]    **Exhibit F**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009),           at           2,           *available           at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last   visited   July   30, 2021) (emphasis added).

information in an open and largely unregulated market.[5]

65.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[6]

66.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[7]

67.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive

---

[5]     *See* **Exhibit G**, Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

[6]     **Exhibit H**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N12061 6S.pdf (last visited July 30, 2021).

[7]     **Exhibit I**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

collections of consumer data.[8]

68.     In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[9]

69.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[10] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Meredith share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of

---

[8]     *See* **Exhibit J**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

[9]     *Id.*

[10]     *See* **Exhibit K**, *Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

fraudulent telemarketers" and other criminals.[11]

70.     Information disclosures like those made by Meredith are especially dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[12]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[13] Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

71.     Thus, information disclosures like Meredith's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is of Meredith bombarded with similar fraudulent

---

[11]     **Exhibit L**, Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times,        May        20,        2007,        *available        at* http://www.nytimes.com/2007/05/20/business/20tele.html  (last  visited  July  30, 2021).

[12]     *Id.*

[13]     **Exhibit M**, *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at*   https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf  (last visited July 30, 2021).

offers from a host of scam artists."[14]

72.     Meredith is not alone in jeopardizing its customers' privacy and well-being in exchange for increased revenue: disclosing customer information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties for compensation is a widespread practice in the publishing and other consumer-products industries.

73.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

74.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

75.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[15]  As a result,

---

[14]     *See id.*

[15]     *See* **Exhibit N**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe,                                    http://www.theagitator.net/wp-

81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

76.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

77.     In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.[17]

78.     These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace: consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent

---

content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited July 30, 2021).

[16]     *Id.*

[17]     *See* **Exhibit O**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

policies of protecting their data.[18]

79.    Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[19]

### *Meredith Unlawfully Rents and Otherwise Discloses for Compensation Its Customers' Private Purchase Information*

80.    Meredith maintains a vast digital database comprised of its customers' Private Purchase Information.  Meredith discloses for compensation its customers' Private Purchase Information to data aggregators and appenders, who then supplement that information with additional personal information about each of its customers, including his or her gender, age, income, ethnicity, policital views, lifestyle interests, preferred travel locations, hobbies, reading habits, health and exercise routines, and sports and outdoor interests.  (*See, e.g.*, **Exhibit A** at 2). The "enhanced" customer lists that Meredith receives back from the data aggregators and data appenders are more valuable to Meredith than its original customer lists,

---

[18]    *See* **Exhibit P**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

[19]    *See* **Exhibit Q**, Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

and can be sold or rented by Meredith to other third parties for more money than its original customer lists. In this way, Meredith increases its profits gained from its sales and rentals of its customer lists.

81.     Meredith then rents, exchanges, and/or otherwise discloses for compensation its customer lists—which include all of its customers' Private Purchase Information, identifying which individuals purchased Meredith's publications, and can include the other sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, direct-mail advertisers, consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibit A**).

82.     Meredith also discloses for compensation its customers' Private Purchase Information to data cooperatives, which in turn give Meredith access to their own list databases. These third-party customer list databases contain information that is valuable to Meredith, as they enable Meredith to identify prospective customers (i.e., "prospects") to whom it can send advertisements and other offers to sell its tangible and/or intangible property, and with whom it can ultimately enter into consumer transactions with and generate revenue from.

83.     In short, Meredith disclosed and continues to disclose its customers' Private Purchase Information to anybody willing to pay for it.

84.     As a result of Meredith's data compiling and sharing practices, companies can purchase, rent, exchange for, or otherwise obtain for compensation mailing lists from Meredith that identify Meredith's customers by their most intimate details, including but not limited to the fact that they purchased Meredith products, which products they purchased and the dollar amount of their purchases, as well as their gender, age, religion, and ethnicity.  Meredith's disclosure of such sensitive and private information to any member of the public interested in purchasing it is invasive of its customers' (including Plaintiffs and Class embers) privacy and intrusive upon their private affairs and concerns in a way that the average person would find highly offensive.  Meredith's disclosures also put its customers at risk of serious harm from scammers.

85.     Meredith failed to provide prior notice of these disclosures to any of its customers as required by Utah Code Ann. 13-37-201, much less obtain their consent prior to making such disclosures. As a result, Meredith's customers in Utah (and elsewhere throughout the country) remain unaware that their Private Purchase Information and other sensitive information is being rented, sold, and otherwise disclosed for compensation on the open market.

86.     Consumers purchase Meredith's products through numerous channels including the Internet, telephone, or traditional mail.  Regardless of how the consumer makes a purchase, during the applicable statutory period Meredith

uniformly failed to provide the notice required by Utah Code Ann. 13-37-201 to –
much less obtain any form of consent from – its Utah-based customers before they
made purchases from Meredith or before Meredith disclosed their Private Purchase
Information to third parties for compensation.

87.     By and through these actions, Meredith has disclosed to third parties
its Utah-based customers' Private Purchase Information for compensation without
providing the requisite prior notice of such disclosures, in direct violation of the
NISNPIA.

## CLASS ACTION ALLEGATIONS

88.     Plaintiffs seek to represent a class defined as all persons in Utah who
had their Private Purchase Information obtained by Meredith on or after January 1,
2004 as a result of a consumer transaction and who, at any point during the
applicable statutory period, had such Private Purchase Information disclosed by
Meredith to one or more third party (the "Class").  Excluded from the Class is any
entity in which Meredith has a controlling interest, and officers or directors of
Meredith.

89.     Members of the Class are so numerous that their individual joinder
herein is impracticable.  On information and belief, members of the Class number in
at least the tens of thousands.  The precise number of Class members and their
identities are unknown to Plaintiff at this time but may be determined through

discovery.  Class members may be notified of the pendency of this action by mail and/or publication through Meredith's distribution records.

90.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to: (a) whether Meredith is a "commercial entity" within the meaning of the NISNPIA; (b) whether Meredith provided the notice required by the NISNPIA to Plaintiffs and Class members before they entered into consumer transactions with Meredith; (c) whether Meredith obtained Plaintiffs' and Class members' Private Purchase Information as a result of consumer transactions, and whether such information constitutes "nonpublic personal information" within the meaning of the NISNPIA; (d) whether Meredith disclosed Plaintiffs' and Class members' Private Purchase Information to a third party; and (e) whether Meredith's disclosures of Plaintiffs' and Class members' Private Purchase Information to third parties violated the NISNPIA.

91.    The named Plaintiffs' claims are typical of the claims of the Class in that the named Plaintiffs and the Class members have all suffered invasions of their statutorily protected right to privacy (as afforded by the NISNPIA) ), as well as intrusions upon their private affairs and concerns that would be highly offensive to a reasonable person,  as a result of Meredith's uniform wrongful conduct, based upon Meredith's  disclosures  of  Plaintiffs'  and  Class  members'  Private  Purchase

Information to third parties for compensation.

92.    Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

93.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Meredith's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Meredith's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

*[This Space Left Blank Intentionally]*

33

## CAUSE OF ACTION
### Violation of Utah's Notice of Intent to Sell
### Nonpublic Personal Information Act
### (Utah Code Ann. § 13-37)

94.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

95.    Plaintiffs bring this claim individually and on behalf of members of the Class against Meredith.

96.    Meredith has one or more office(s) or other place(s) of business in Utah, including but not limited to at 1108 E. South Union Ave., Midvale, Utah 84047 (a location overseen by Meredith's registered agent on Meredith's behalf). Additionally, Meredith has employees who work for Meredith from Utah (and thus conduct business on Meredith's behalf at places in Utah). And in the ordinary course of its business, Meredith enters into transactions with consumers in Utah. Accordingly, Meredith is a "commercial entity" within the meaning of the NISNPIA. *See* Utah Code Ann. § 13-37-102(2)(a).

97.    On or after January 1, 2004, Plaintiffs purchased subscription(s) to magazines from Meredith, constituting "tangible" or "intangible" property.

98.    Meredith's sales of tangible and/or intangible property belonging to Plaintiffs, including subscriptions to several of its magazines, were initiated or completed in Utah, where Plaintiffs resided at the time she purchased her subscriptions and where she received her subscriptions in the mail.  Accordingly,

Meredith entered into "consumer transactions" with Plaintiff within the meaning of the NISNPIA. *See id.* § 13-37-102(4)(a)(i).

99.    As a result of such consumer transactions, Meredith obtained information pertaining to Plaintiff that Plaintiff provided at Meredith's request, and which Meredith would not otherwise have obtained but for entering into such consumer transactions with Plaintiff. *See id.* § 13-37-201(1)(b). This information, referred to herein as Plaintiffs' Private Purchase Information, included Plaintiffs' "purchasing habits" and "personal preferences" within the meaning of the NISNPIA.

100.   At various times during the applicable statutory period, Meredith disclosed Plaintiffs' Private Purchase Information, which identified her as a purchaser of particular *Meredith* magazines, in at least three ways.

101.   First, Meredith disclosed customer lists containing Plaintiffs' Private Purchase Information to data aggregators and data appenders, who then supplemented the lists with additional sensitive information from their own databases, before sending the lists back to Meredith.

102.   Second, Meredith disclosed mailing lists containing Plaintiffs' Private Purchase Information to data cooperatives, who in turn gave Meredith access to their own consumer list databases.

103.   Third, Meredith rented, sold, exchanged, and/or otherwise disclosed its customer lists containing Plaintiffs' Private Purchase Information—enhanced with

additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

104.   Because many of Meredith's customer lists included the additional information from the data aggregators and appenders, the lists were more valuable and Meredith was able to increase its profits gained from the list rentals and/or exchanges.

105.   Meredith made each disclosure of Plaintiffs' Private Purchase Information, to each of the entities described in the preceding paragraphs, for compensation – namely, money. Indeed, Meredith's disclosures of Plaintiffs' Private Purchase Information were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase Meredith's revenue.

106.   The information Meredith disclosed indicates Plaintiffs' names and addresses, as well as the fact that she purchased subscriptions to particular Meredith publications, which was information not otherwise in the public domain. *See id.* § 13-37-102(5). Because the records or information disclosed by Meredith reveal Plaintiffs' "purchasing patterns" and "personal preferences," and "identif[y] [Plaintiff] in distinction from other persons," the records or information Meredith

disclosed to third parties constitute "nonpublic personal information" within the meaning of the NISNPIA. *See id.* § 13-37-102(5).

107.   Neither Plaintiffs nor any member of the Class consented to Meredith disclosing their Private Purchase Information to anyone.

108.   Worse yet, at no time before entering into consumer transactions with Meredith or providing their Private Purchase Information to Meredith did Plaintiffs or any member of the Class receive the notice required by Utah Code Ann. § 13-37-201. Specifically, prior to entering into consumer transactions with Plaintiffs and Class members and obtaining Plaintiffs' and Class members' Private Purchase Information,  Meredith failed to provide Plaintiff or any member of the Class with a clear and conspicuous notice in dark bold writing (or orally), such that a reasonable person would perceive the notice, stating that "[w]e may choose to disclose nonpublic personal information about you, the consumer, to a third party for compensation." *Id.* § 13-37-201(3)(a).

109.   Meredith's disclosures of Plaintiffs' and Class members' Private Purchase Information were not made to third parties in "relat[ion] to the third part[ies] providing to [Meredith] . . . services, including business outsource services[,] personal or real property[,] or other thing[s] of value," and the "compensation received by [Meredith] as part of the transaction[s] [with third parties] [was not] received by [Meredith] for or in consideration of such "third

part[ies] providing to [Meredith] [such] services, . . . personal or real property[,] or other thing[s] of value." *Id.* § 13-37-201(5).

110.   Meredith's undisclosed, nonconsensual disclosures of all of its customers' Private Purchase Information intruded substantially upon the solitude and seclusion (including the personal affairs and concerns) of each of the Plaintiffs and Class members, in a way that was highly offensive to Plaintiffs and would be highly offensive to a reasonable person, including members of the Class.

111.   Meredith is not "subject to a federal law or regulation that governs the disclosure of nonpublic information to a third party," nor is Meredith "a covered entity as defined in 45 C.F.R. Parts 160 and 164." *See* Utah Code Ann. § 13-37-201(4).

112.   By disclosing Plaintiffs' and Class members' Private Purchase Information to third parties for compensation, without providing prior notice to Plaintiff or Class members as required by Utah Code Ann. § 13-37-201, Meredith violated Plaintiffs' and Class members' statutorily protected right to privacy in their nonpublic personal information pertaining to their consumer transactions, as afforded by the NISNPIA. *See id.* § 13-37-202(1) ("A commercial entity may not disclose nonpublic personal information that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction if the commercial entity fails to comply with Section 13-37-201.").

113.   On behalf of herself and the Class, Plaintiffs seek: (1) $500.00 to Plaintiffs and each Class member, for each time Defendant failed to provide them the notice required by the NISNPIA in relation to their Private Purchase Information, pursuant to Utah Code Ann. § 13-37-203(2)(a); and (2) costs pursuant to Utah Code Ann. § 13-37-203(2)(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A.   For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

B.   For an order declaring that Defendant's conduct as described herein violated Utah's Notice of Intent to Sell Non-Public Information Act;

C.   For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

D.   For an award of $500.00 to Plaintiffs and each Class member, for each time Defendant failed to provide them the notice required by the NISNPIA in relation to their Private Purchase Information, as provided by the NISNPIA, Utah Code Ann. § 13-37-203(2)(a);

E.   For prejudgment interest on all amounts awarded; and

F.   For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit pursuant to Rule 23 and Utah Code Ann. § 13-37-203(2)(b).

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated: August 5, 2024                Respectfully submitted,

PETERS | SCOFIELD
*A Professional Corporation*

/s/ David W. Scofield
DAVID W. SCOFIELD

DAVID W. SCOFIELD – 4140
PETERS | SCOFIELD
*A Professional Corporation*
7430 Creek Road, Suite 303
Sandy, Utah 84093-6160
Telephone:   (801) 322-2002
Facsimile:    (801) 912-0320
E-Mail:        dws@psplawyers.com

FRANK S. HEDIN*
ARUN G. RAVINDRAN*
HEDIN LLP
1395 Brickell Avenue, Suite 610
Miami, Florida 33131
Tel: 305.357.2107
fhedin@hedinllp.com
aravindran@hedinllp.com

* Pro Hac Vice App. Forthcoming

*Attorneys for Plaintiffs and the Putative Class*