Frank S. Hedin (*Pro Hac Vice*)
**HEDIN LLP**
1395 Brickell Avenue, Suite 610
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801
fhedin@hedinllp.com

David W. Scofield – 4140
**PETERS | SCOFIELD**
*A Professional Corporation*
7430 Creek Road, Suite 303
Sandy, Utah 84093-6160
Telephone:     (801) 322-2002
Facsimile:     (801) 912-0320
E-Mail:     dws@psplawyers.com

*Attorneys for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| NOVELLA ATWOOD; CHRISTINE CID; CHERALEE ENGLAND; KATHLEEN GAGON; KRISTEN PUERTAS; JANICE RANDALL; and SARAH TYCHSEN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DOTDASH MEREDITH,<br><br>Defendant. | **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br><br>Case No. 1:24-cv-00046-AMA-PK<br><br>District Judge Tena Campbell<br>Magistrate Judge Daphne A. Oberg |

Plaintiffs Novella Atwood, Christine Cid, Cheralee England, Kathleen Gagnon, Kristen Puertas, Janice Randall, and Sarah Tychsen file this Opposition to Defendant Dotdash Meredith's ("Defendant" or "Meredith") Motion to Dismiss Plaintiffs' First Amended Complaint ("the Motion," cited as "Mot.") (ECF No. 22) and state as follows:

## INTRODUCTION

In this class action, Plaintiffs allege in their First Amended Complaint ("FAC") that Meredith rented, sold, exchanged, and otherwise disclosed for compensation Plaintiffs' and all of its other Utah customers' nonpublic personal information – including information Defendant had gathered in connection with Plaintiffs' subscriptions to various Meredith publications – to any third party interested in acquiring it, such as data aggregators, data appenders, data cooperatives, and aggressive advertisers. The nonpublic personal information Defendant disclosed included Plaintiffs' full names, home addresses, the fact that they subscribed to a Meredith publication, details concerning their subscription, and other categories of individualized demographic information, including age, gender, income, whether they have children, their children's ages, and more. And egregiously, Defendant made these disclosures without providing Plaintiffs or any of its other Utah customers prior notice that it would do so. By disclosing Plaintiffs' nonpublic personal information to third parties for compensation without first providing Plaintiffs with clear and conspicuous notice of these practices (and thus an opportunity not to be subjected to them before they subscribed), Defendant violated Utah's Notice of Intent to Sell Nonpublic Personal Information Act, Utah Code § 13-37-101, *et. seq*. (the "NISNPIA").

Meredith argues for dismissal of the FAC on four grounds: *first*, that the FAC fails to state a claim because Meredith denies it is a "commercial entity" under the NISNPIA statute; *second*, that the FAC fails to state a claim because it does not allege Defendant disclosed Plaintiffs' nonpublic information; *third*, that Plaintiffs' claim is barred by the statute of limitations; and *fourth*, that the case should be dismissed for subject matter jurisdiction because Plaintiffs lack Article III standing, NISNPIA purports to bar class actions, and comity counsels against the Court's exercise of jurisdiction. Each of Defendant's arguments is meritless.

First, Defendant's argument that it is not a "Commercial Entity" covered by NISNPIA is baseless. As is relevant to the Motion, NISNPIA requires only that a defendant have an office or place of business in Utah, which the FAC alleges, and Defendant's own disclosures to the Utah Department of Commerce confirm. The Court is bound to accept the FAC's well-pled allegations as true and therefore must reject Defendant's couched denial that it does not have an office or place of business in Utah.

Second, Defendant contends that the FAC fails to allege the disclosure of Plaintiffs and the Class's nonpublic personal information. This argument fails as well. The FAC is replete with allegations detailing Defendant's NISNPIA violative disclosures (for compensation) to various consumer data industry participants corroborated by evidence presented in the FAC of such disclosures to a data broker. A legion of federal courts has determined that similarly corroborated allegations clear the Rule 8 threshold to state claims under analogous data privacy statutes. This Court should follow these well-reasoned authorities and reject Defendant's attempt to impose an inapplicable (and impossibly high) pleading standard on a statute designed to safeguard the privacy rights of Utah consumers.

Third, Defendant asserts that Plaintiffs' claims are barred by the statute of limitations. Here Defendant bears, but fails to carry, the burden of asserting the statute of limitations as an affirmative defense. The FAC does not give rise to a statute of limitations defense, nor are Plaintiffs required to plead the non-existence of a statute of limitations defense. Under Rule 8, Plaintiffs are required only to plead facts that give rise to a plausible claim for relief, which they have done.

Fourth, with respect to Article III standing, Defendant's disclosures of Plaintiff's nonpublic personal information concretely harmed the very privacy interests the NISNPIA statute confers upon Utah consumers – namely, preventing unauthorized and uninformed disclosure of their nonpublic personal information to third parties for compensation and being free from intrusions into one's private affairs and concerns (including personal preferences and purchasing habits). Judge Parrish's thoughtful analysis of the identical argument in *Curry v. Mrs. Fields Gifts,*

*Inc.*, 2024 WL 3794487, at *3-5 (D. Utah Aug. 13, 2024) (unpublished) [hereinafter "*Curry II*"] is instructive, recognizing that disclosures materially similar to those alleged in this case harmed privacy interests well rooted in common law, which the Utah legislature sought to protect. Here, Defendant's infringement of Plaintiffs' concrete privacy interests afforded by NISNPIA – in preventing disclosures of nonpublic information and being free of intrusions into their personal affairs – manifested intangible harm sufficient to satisfy Article III.

Finally, Defendant's argument concerning NISNPIA's purported class action bar is in derogation of Supreme Court precedent. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) (holding that state law class action bars like the one in the NISNPIA are preempted before federal courts sitting in diversity). Again, in a recent thorough and well-reasoned decision, Judge Parrish methodically applied *Shady Grove's* preemption analysis to NISNPIA, holding, under identical facts as here, that because NISNPIA's class action bar "is not part of Utah's framework of substantive rights and remedies" Rule 23 preempts NISNPIA's class action bar and plaintiffs may bring a NISNPIA class action in federal courts. *Curry v. Mrs. Fields Gifts, Inc.*, No. 2:22-cv-00651-JNP-DBP, 2023 WL 6318108, at *1 (D. Utah Sept. 28, 2023) (unpublished). This Court should follow *Curry*'s reasoning and find the same. Defendant also asks the Court to use its inherent power to decline jurisdiction on comity grounds. However, Defendant provides no good reason why the rarely applied comity doctrine applies here.

The FAC adequately states a claim for Defendant's violation of NISNPIA and the Court has subject matter jurisdiction. The Motion should be denied in its entirety.

## THE PERTINENT STATUTORY SCHEME

Pursuant to the NISNPIA, "[a] commercial entity[1] may not disclose nonpublic personal information[2] that the commercial entity obtained on or after January 1, 2004, as a result of a

---

[1] A "commercial entity" is a person that "has an office or other place of business located in [Utah]" and "in the ordinary course of business transacts a consumer transaction in [Utah]." *Id.* § 13-37-102(2)(a).

[2] "Nonpublic personal information" means "information that . . . is not public information" and, "either alone or in conjunction with public information, identifies a person in distinction from other

3

consumer transaction[3] if the commercial entity fails to comply with Section 13-37-201." Utah Code § 13-37-202. Section 13-37-201, in turn, requires a commercial entity to provide the consumer with notice if "the commercial entity enters into a consumer transaction with that person[,]" "as a result of the consumer transaction … the commercial entity obtains nonpublic personal information concerning that person[,]" and "the commercial entity intends to or wants the ability to disclose the nonpublic personal information … to a third party … for compensation," where such compensation "is the primary consideration for the commercial entity disclosing the nonpublic personal information," and is "directly related to the commercial entity disclosing the nonpublic personal information[.]" *Id.* § 13-37-201(1)(a); § 13-37-201(5).

## ARGUMENT

### I. Plaintiffs Have Sufficiently Alleged Meredith Is a Commercial Entity

NISNPIA applies to a "commercial entity" that has an office "or other place of business located in [Utah]" and, which, "in the ordinary course of business transacts a consumer transaction in" Utah. Utah Code §§13-37-102(2)(a), 13-37-203(1). Plaintiffs have sufficiently alleged facts which plausibly establish that Defendant is a "commercial entity" under NISNPIA.

Specifically, the FAC alleges that "Meredith has one or more office(s) or other place(s) of business in Utah, including but not limited to 1108 E. South Union Ave., Midvale, Utah 84047 (a location overseen by Meredith's registered agent on Meredith's behalf). Additionally, Meredith has employees who work for Meredith from Utah (and thus conduct business on Meredith's behalf at places in Utah)." (FAC ¶ 46). Defendant concedes that the FAC sufficiently alleges facts that satisfy the second requirement that Defendant transacts business in Utah. (Mot. at 10). But Defendant challenges that it is a "commercial entity", specifically that having a registered agent in

---

persons." *Id.* § 13-37-102(5)(a). "Nonpublic personal information" expressly includes, *inter alia*, "the purchasing patterns of a person" or "the personal preferences of a person." *Id.* § 13-37-102(5)(b)(iii)-(iv) (emphasis added).
[3] "Consumer transaction" means, *inter alia*, "a sale, lease, assignment, award by chance, or other written or oral transfer or disposition … of[] goods[,] services[,] or other tangible or intangible property, … that is initiated or completed in [Utah]." *Id.* § 13-37-102(4)(a)(i) (emphasis added).

Utah is insufficient to establish it has a place of business or office in the state. (Mot. at 8). There are myriad problems with Defendant's argument. First, Defendant disclosed to the Utah Department of Commerce in its initial application to transact business in Utah that the "street address of the **registered office** in Utah" was "215 S. State Street, Suite 960, Salt Lake City." (Application of Authority Conduct Affairs for a Foreign Corporation, attached hereto as **Exhibit A**[4]) (emphasis added). Defendant made this application on September 7, 2005**,** over a year after NISNPIA's effective date on January 1, 2004. *See Id.* Under Utah's Revised Business Corporation Act "Registered office" means **the office within this state designated by a domestic or foreign corporation** as its registered office in the most recent document on file with the division providing that information[.]"). *See* Utah Code 16-10a-102(30). Further, the application's disclosed registered agent, National Registered Agents, Inc., is a "commercial registered agent". Utah Code § 16-17-203(1) only required "the name of [Defendant's] commercial registered agent," *id.,* § 16-17-203(1)(a) – not "the name and address of the entity's noncommercial registered agent" – on the application. *Id.* § 16-17-203(1)(b)(i). Thus, the Application completed by Defendant identifies the address of **Defendant's** "office in Utah" for purposes of NINSPIA. And it makes no difference that Defendant has appointed an agent to accept service of process on its behalf at its registered office, that the office is maintained by that agent, or that Defendant has since changed registered agents to CT Corporation (Mot. at 7). A principal (in this case the Defendant) acts through its agent, and the agent stands in the shoes of the principal in the eyes of the law. An office maintained by Defendant's agent on Defendant's behalf – as pled in the FAC – and at Defendant's direction, where Defendant, *inter alia*, receives mail and accepts service of legal documents, clearly constitutes an "office" of (or a "place of business of") Defendant within the meaning of Utah's statutes.[5]

---

[4] The foreign corporation listed on the application is About Inc., a former name of Defendant (Mot., Ex. 1).

[5] Defendant's sole support for the proposition that "The presence of a registered agent's office in Utah is insufficient to establish that a company has an office or place of business in the state[]" (Mot. at 8) is *Camoras v. Publishers Clearing House, LLC*, 2024 WL 2262786 at * 2 (D. Utah

Second, the FAC identifies that Defendant has "**one or more office(s) or other place(s) of business in Utah.**" (FAC ¶ 46). Defendant submits that this allegation is implausible, stating: "[i]t is not a plausible inference that a Delaware corporation that maintains its principal place of business in New York, has an office or place of business in Utah, based on the location of its registered agent and Plaintiffs' vague allegations of 'other offices'." (Mot. at 9). This assertion is merely a couched denial that should not be considered. *See Salmon v. CRST Expedited, Inc.*, No. 14-CV-265-CVE-TLW, 2014 WL 4656499, at *2 (N.D. Okla. Sept. 17, 2014) (unpublished) ("A defendant's "mere denial" of the plaintiff's allegations has no bearing on the Court's ruling on a motion to dismiss under Rule 12(b)(6)."). Rather, the Court is obligated to accept the FAC's allegations as true and construe them in the light most favorable to the plaintiff. *See Jojola v. Chavez*, 55 F.3d 488, 490 (10th Cir. 1995). Plaintiffs need not describe "every fact in specific detail[,]" *Hamilton v. Angerhofer*, No. 2:15-CV-344 DB, 2017 WL 935885, at *1 (D. Utah Mar. 8, 2017) (unpublished), but only "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 547 (2007). Whether Defendant had any other office(s) remains an open question, one that ultimately will be answered through discovery. But at this stage, Plaintiffs have alleged facts which, consistent with Rule 8, plausibly give rise to Defendant being a NISNPIA-covered "commercial entity" and that ultimately state a claim.

Third, the FAC's allegation that "Meredith has employees who work for Meredith from Utah (and thus conduct business on Meredith's behalf at places in Utah)[]" (FAC ¶ 46) is not a fact that may be discounted based on Defendant's supposition that the employees might incidentally be in Utah for personal or other reasons as the Motion suggests. (Mot. at 10). Rule 12(b)(6) obligates the Court to consider the plausibility of Plaintiffs' well-pled allegations, not

---

May 17, 2024), a non-final order of a Magistrate Judge to which Plaintiff's objections are still pending before the district court. *See Id,* (Dkt. 26) (Jun. 1, 2024). The objections assert that the Magistrate exceeded the bounds of 28 U.S.C. §636(b)(1) by issuing dispositive orders instead of issuing a report and recommendation, compounded this error by reaching a case dispositive issue without adversarial briefing, and misapplied Fed. R. Civ. P. 15 and Fed. R. Civ. P. 8 by denying that plaintiff the ability to amend his Complaint. (*See generally*, *id.*). Plaintiffs submit that even if *Camoras* is adopted by the district court, it was wrongly decided and should not be followed.

Defendant's suppositions in determining whether Plaintiffs have stated a claim.  *See Lowrey v. RangeWater Real Est. LLC*, 2024 WL 1344465, at *2 (D. Ariz. Mar. 28, 2024) (unpublished) (defendant's alternative explanations cannot undermine the complaint's well pled allegations in adjudicating a motion to dismiss).  Again, discovery will ultimately bear out whether Defendant indeed has employees who work for Meredith from Utah and thus conduct business on Meredith's behalf at places in Utah as alleged in the FAC.[6]

## II. Plaintiffs Have Sufficiently Alleged Defendant Disclosed Their Nonpublic Personal Information

Defendant next asserts that the FAC does not allege that Defendant disclosed nonpublic personal information in violation of the NISNPIA and thus fails to state a claim.  (Mot. at 10-13).  Defendant's characterizations of the FAC's allegations and the argument for dismissal on this ground are baseless.  First, the FAC includes numerous allegations concerning Defendant's dissemination without prior notice of Plaintiffs' and the class's nonpublic personal information that Defendant obtained through commercial transactions with its Utah subscribers.  Specifically, the FAC details the types of organizations to whom Defendant disclosed Plaintiffs' and the class's

---

[6] Defendant also argues (albeit in a footnote) (Mot. at fn. 4) that the floor debate concerning NISNPIA and draft iterations of the bill suggest that Utah legislature intended for NISNPIA to be applied only to companies with a certain degree of "an in-state presence".  Defendant does not explain the degree of in-state presence required but generally asserts that the FAC's allegations regarding Defendant's Utah-presence are overbroad.  Defendant's contention is untenable because its reference to floor debates and prior versions of the bill are irrelevant, unless the statute is facially ambiguous.  *See Phillips Petroleum Co. v. Lujan*, 4 F.3d 858, 861 (10th Cir. 1993) ("The best evidence of Congressional intent is the text of the statute itself and where the language is unambiguous, our inquiry is complete.")  Here, the NISNPIA statute could not be clearer – the "commercial entity" requirement does not have a "domiciled in Utah" component on its face and hence the Court need not look to legislative history.  Whether a legislator at some point in the legislative process proposed limiting the NISNPIA to "national companies" (Mot. at fn. 4) as suggested, that notion was obviously left behind in the legislative process.  The plain statutory text must control, and the Court is bound to apply the statute as passed, not as it may have been contemplated at some earlier point in time. *See Zilleruelo v. Commodity Transporters, Inc.*, 2022 UT 1, ¶ 34, 506 P.3d 509, 515–16 (citation omitted) ("[S]tatements of individual legislators 'should not be entitled to any weight' when the statements contradict the plain language of a statute.").

personal information in violation of NISNPIA and each of their respective interests in obtaining this nonpublic information – data aggregators, data appenders, data cooperatives, aggressive advertisers, list brokers, political organizations, non-profit companies, consumer-facing businesses, and other third parties seeking to contact Meredith's subscribers for their own independent business purposes. (FAC, ¶ 1, ¶ 6, ¶ 12, ¶ 17, ¶ 22, ¶¶ 61-73, ¶¶ 80-87, ¶¶ 100-105). Moreover, the FAC specifies that these disclosures concerned all of Defendant's subscribers, including Plaintiffs.  (FAC, ¶ 6 (emphasis added) ("To supplement its revenues, Meredith rents and sells (for money), exchanges (for other valuable consumer data), and otherwise discloses for compensation **all of its customers' information**…"); *see also* FAC, ¶ 81, ¶ 110).

Defendant claims the FAC fails to state a claim because it fails to identify to whom Defendant's disclosures were made, what information was disclosed, and when it was disclosed. But the FAC identifies the exact conduct which gives rise to Plaintiffs' claims – the disclosure of Plaintiffs' and the class's nonpublic personal information, including the fact that they were subscribers to a particular Meredith publication among other non-public facts, to various types of identified third parties during the statutory period. Plaintiffs easily meet Rule 8's requirements and cannot be reasonably expected to know, at this stage, the ins and outs of all of Defendant's illegal practices.  *See PHL Variable Ins. Co. v. Sheldon Hathaway Fam. Ins. Tr. ex rel. Hathaway*, No. 2:10-CV-67, 2011 WL 703839, at *2 (D. Utah Feb. 20, 2011) (unpublished) (the facts alleged in the complaint need only "be specific enough to put the defendant on notice of the conduct alleged given the context of the sort of case before the court.").  Ultimately, the discovery process will reveal all the counterparties to Defendant's alleged NISNPIA's violations, the dates of disclosure, the full substance of the disclosure, and the like. But at present, Defendant is sufficiently on notice of the basis of Plaintiffs' entitlement to relief, and this is grounds alone to deny the motion.  *See Curry,* 2023 WL 6318108, at *9 (D. Utah Sept. 28, 2023) (finding based on identical allegations that "Plaintiffs plead unauthorized disclosure under NISNPIA sufficient to support a cause of action at this stage.  If Defendant seeks to dispute these factual allegations, they will have ample opportunity to do so at later stages of this litigation."); *Huggins v. Hilton*, 180 F. App'x 814, 816

(10th Cir. 2006) (unpublished) ("[T]he simplified notice pleading standard merely represents the first step in a system adopted to focus litigation on the merits of a claim.").

Second, the FAC goes further still, including documented evidence of Defendant's offers to rent via list broker AudienceFirst Media ("AFM") an "Enhanced Masterfile" of Defendant's subscriber database of subscribers' nonpublic personal information, and more egregiously, a subscriber database titled "Families with Children," and another titled "Seniors". (FAC, Ex. A-C). Each data card was updated in June 2023. (*Id.*) The thrust of Defendant's argument is that it is speculative to conclude that Plaintiffs' information was included on the lists offered for rent by AFM or that Meredith was the one who disclosed the information. (Mot. at 11). The argument is spurious. As stated, the FAC plainly alleges Defendant's disclosures involved all of its customers, including Plaintiffs. Moreover, numerous courts have rejected this very argument in the context of motions to dismiss claims under an analogous state privacy law – Michigan's Preservation of Personal Privacy Act ("PPPA"), Mich. Comp. Laws § 445.1712, *et. seq*. *See e.g. Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 682-683 (W.D. Mich. 2018) ("Given that GameStop possessed the Game Informer subscription information and that NextMark [a data broker] purported to sell that information, the implication that GameStop disclosed the information to NextMark or other data-mining companies passes the threshold of plausibility.").[7]

---

[7] *See also Gaines v. Nat'l Wildlife Fed'n,* No. 22-11173, 2023 WL 3186284, at *4 (E.D. Mich. May 1, 2023) (unpublished) ("In sum, the Amended Complaint sufficiently alleges that Defendant disclosed [private reading information] in violation of the [PPPA] as evidenced by that information being available for sale from NextMark during the relevant pre-July 31, 2016 period."); *Gottsleben v. Informa Media, Inc.*, No. 1:22-CV-866, 2023 WL 4397226, at *5 (W.D. Mich. July 7, 2023) (unpublished) (finding allegation that Defendant violated the PPPA plausible based, *inter alia*, on complaint's inclusion of NextMark datacard); *Batts v. Gannett Co.*, 2023 WL 3143695, at *4–5 (E.D. Mich. Mar. 30, 2023) (same); *Russett v. NTVB Media, Inc.*, No. 22-10352, 2023 WL 6315998, at *2 (E.D. Mich. Sept. 28, 2023) (same); *Nock v. Boardroom, Inc.*, No. 22-CV-11296, 2023 WL 3572857, at *4 (E.D. Mich. May 19, 2023) (same); *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 452 (S.D.N.Y. 2016) (same); *see also Piper v. Talbots, Inc.*, 507 F. Supp. 3d 339, 344 (D. Mass. 2020) (unpublished) (finding that plaintiff stated a claim under Virginia's Personal Information Privacy Act based on complaint's inclusion of NextMark data card).

Rule 8 neither obligates Plaintiffs to catch Defendant red-handed nor to prove beyond a reasonable doubt that Defendant violated NINSPIA to state a claim. Rather, Rule 8 requires that Plaintiffs allege facts, which, when accepted as true and considered on the whole, plausibly give rise to a claim for relief. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). Plaintiffs have done just that.

Defendant's only support for its ill-conceived argument that the FAC fails to state a claim despite the FAC's detailed factual averments and supporting evidence is *Nashel v. N.Y. Times Co.*, 2022 WL 6775657 at * 4 (E.D. Mich. Oct. 11, 2022) (unpublished) and *Wheaton v. Apple, Inc.*, 2019 WL 5536214, at *4-5 (N.D. Cal. Oct. 25, 2019) (unpublished), cases where courts found that allegations including reference to a list broker's data card failed to state claim under analogous state privacy statutes. These cases are readily distinguishable and, in any event, were wrongly decided and are clear outliers that fundamentally break a proper application of the Rule 8 standard. As to *Nashel*, the data cards in that case were from 2006 and 2008 and proffered to support a statutory violation of Michigan's PPPA in a finite window of less than one year before July 2016. The court concluded the plaintiff failed to state claim finding: "Because Plaintiffs cannot otherwise account for the near-decade time gap, the data cards make the complaint's allegations merely *possible* rather than plausible." *Nashel*, 2022 WL 6775657 at *5 (E.D. Mich. Oct. 11, 2022). There is no similar timing issue here. The data cards referenced in the FAC predated the filing of this Action by only about six months. Further, *Nashel* should not be followed because the decision misapplied the Rule 8 standard. *Nashel* improperly analyzed the plausibility of the complaint's allegations. *See Nashe*l, 2022 WL 6775657, at *5 (stating that "the data cards make the complaint's allegations merely possible rather than plausible"). This was a plain error.

*Wheaton* is equally unavailing. In *Wheaton* the defendant disputed the plausibility of state privacy violations arising from alleged disclosures of specific music tracks stored on the plaintiffs' phones. Plaintiffs relied on a data broker's data cards advertising the sale of this consumer listening data, *e.g.*, their music selection purchases, to bolster those allegations. 2019 WL 5536214 at *4 (N.D. Cal. Oct. 25, 2019). The *Wheaton* court found the data card's contents were too

speculative to establish the plausibility of the plaintiffs' claims because "[the data card] fails to mention the third-party data broker name, Apple, or even iTunes. Thus, the exhibit does not show that Apple disclosed customers' personal listening information." *Id.* By contrast, the data card here carries every indicia that Defendant disclosed its subscribers' nonpublic personal information. The data card carries Defendant's name, its logo, the data broker's logo, and provides the name of 15 Meredith publications, each denoted as carrying a registered trademark. (FAC, Ex. A-C); *see also Lee v. Belvoir Media Grp., LLC*, No. 22-12153, 2023 WL 6304682, at *4 (E.D. Mich. Sept. 27, 2023) ("[B]y contrast, in this case, the data card incorporated and attached to the amended complaint contains the 'Belvoir Media Group' name and trademark and advertises that the list on offer 'consist[s] of the subscribers to all of Belvoir's newsletters.' It also identifies NextMark as a list broker. *Id*. The data card here thus does not suffer from the same defects that were fatal to the Wheaton plaintiffs' claims.")

Further, *Wheaton* like *Nashel* misapplies Rule 8's plausibility standard. The *Wheaton* court was bound to accept the plaintiffs' allegations that Apple disclosed consumers' personal listening data as true and should not have found that the data cards' failure to conclusively establish the claim undermined the complaint's allegations writ large. Thus, it is not surprising that several courts have specifically rejected *Nashel* and Wheaton's reasoning.[8]

Defendant's contention that Plaintiffs have failed to adequately allege disclosure is baseless and the Motion should be denied.

---

[8] *See e.g., Russett*, 2023 WL 6315998 (E.D. Mich. Sept. 28, 2023) (explicitly declining to follow *Nashel* and *Wheaton* for proposition that complaint's allegations failed to state a plausible claim); *Lee*, 2023 WL 6304682, at *4 (E.D. Mich. Sept. 27, 2023) (rejecting *Nashel* stating "Because plaintiffs need not prove their claims at this stage of the proceedings, the presentation of the 2022 data card, along with specific allegations regarding a similar data card which existed for the relevant time period, suffices to state a plausible PPPA claim."); *Gaines*, 2023 WL 3186284, at *5 (E.D. Mich. May 1, 2023) (distinguishing *Nashel* and finding *Wheaton* inapplicable).

### III. Defendant Has Failed to Establish that Plaintiffs' NISNPIA Claim is Barred by the Statute of Limitations

Defendant's third argument concerning the statute of limitations also fails. Defendant assert the FAC fails to state a claim because it does not allege that Defendant violated NISNPIA during the statutory period. "As an affirmative defense, the statute of limitations can be raised on a motion to dismiss only if the complaint itself plainly establishes the defense." *Lassley v. Aminokit Lab'ys, Inc.*, No. 15-CV-01531-REB-MJW, 2015 WL 9437879, at *1 (D. Colo. Nov. 18, 2015), *report and recommendation adopted*, No. 15-CV-01531-REB-MJW, 2015 WL 9315742 (D. Colo. Dec. 23, 2015) (unpublished); *see also Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 671 (10th Cir. 2016) (internal quotation marks omitted) ("A statute of limitations defense may be appropriately resolved on a Rule 12(b) motion when the dates given in the complaint make clear that the right sued upon has been extinguished."). Here, Plaintiffs have repeatedly alleged that Defendant's NSINPIA-violative disclosures of Plaintiffs' nonpublic personal information occurred during the statutory period. (FAC ¶ 12, ¶ 17, ¶ 21, ¶ 27, ¶ 32, ¶ 37, ¶ 86, ¶ 88, ¶ 100). Defendant cannot meet its burden to show that the FAC's well-pled allegations invalidate Plaintiffs' claim on statute of limitations grounds. *See Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018) (stating a court may grant a motion to dismiss based on statute of limitations defense only "when the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements"); *see also Xechem, Inc. v. Bristol–Myers Squibb Co.,* 372 F.3d 899, 901 (7th Cir. 2004) ("Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)."). The Motion should be denied on this basis.

Defendant also argues that Plaintiffs fail to allege particular facts that their claims accrued during the statute of limitations, *e.g.*, that Defendant's made NISNPIA violative disclosures of Plaintiffs' nonpublic personal information within the statutory period. Factually, that is wrong. As set forth above, Plaintiffs repeatedly alleged that Defendant's disclosures of their nonpublic

personal information occurred during the statutory period.[9] Legally, the argument is unsound because Plaintiffs are not required to plead around potential affirmative defenses. Rule 8 does not require, as Defendant posits, that the FAC "plead facts demonstrating that their claims are within the statute of limitations[]". (Mot. at 14). *See Fernandez*, 883 F. 3d at 1299 (10th Cir. 2018) citing *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) ("A plaintiff need not anticipate in the complaint an affirmative defense that may be raised by the defendant; it is the defendant's burden to plead an affirmative defense."). Rather, under Rule 8 Plaintiffs need only allege facts plausibly establishing that Defendant violated their NISNPIA rights. *See Aquashield, Inc. v. Sonitec Vortisand, Inc.*, No. 1:13-CV-119, 2013 WL 5524598, at *7 (E.D. Tenn. Oct. 4, 2013) ("Plaintiffs' claim need only sufficiently plead the elements of the Lanham Act such that the claim is facially plausible, and specific dates are not a required element."); *Green Hills Dev. Co., LLC v. Oppenheimer Funds, Inc.*, No. 3:19-CV-416-DPJ-FKB, 2020 WL 4489460, at *6 (S.D. Miss. Aug. 4, 2020) (cleaned up) ("Green Hills responds to such averments by observing that UMB Bank and Oppenheimer failed to plead the dates, so there is no way to know if the acts are time barred. Possibly so, but a statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like. In other words, a claim could be sufficiently pleaded though the defendant's affirmative defense is not yet evident."); *Ring v. Roto-Rooter Servs. Co.*, No. 1:10-CV-179, 2010 WL 2367355, at *1 (S.D. Ohio June 9, 2010) ("Defendant will be able to

---

[9] Though the Court need not reach this issue to deny the Motion, the limitation period applicable to a NISNPIA claim is three years, not one as Defendant argues. (Mot. at 13). NISNPIA claims are governed by the three-year limitation period found in Utah Code § 78B-305(4) which sets the limitations period for a statutory cause of action like NISNPIA where the statute itself does not provide a specific limitation period. Defendant's only support for a one-year statute is a citation to *In re Castletons, Inc.*, 990 F.2d 551, 557-58 (10th. Cir. 1998), concerning Utah's Late Check Return Statute ("ULCRS"), Utah Code § 70A-4-302(a), which penalizes banks that dishonor a check but fail to return the check before midnight of the same banking day. *Id.* at 58. As another court of this District recognized, *Castletons* is unhelpful on the statute of limitations issue outside of the specific statutory context of the ULCRS. *See Roberts v. C.R. England, Inc.*, 318 F.R.D. 457, 502 (D. Utah 2017) (Shelby, C.J.).

challenge the merits of whether it, in fact, took an adverse employment action against Plaintiff within the limitations period after discovery."). Rule 8 requires no more than what the FAC already alleges and the motion should be denied.[10]

What Defendant really wants to do by advancing arguments such as these, is to turn NISNPIA into a toothless tiger. The crux of this lawsuit is that Defendant *failed to inform* Plaintiffs and proposed Class members that it would disclose their Private Purchase Information to third parties for compensation prior to doing so. *See generally* FAC. Thus, under the circumstances alleged in the FAC, Plaintiffs cannot possibly be expected to allege the specific dates of these non-consensual, uninformed disclosures or all the entities to whom Defendant made these non-consensual, uninformed disclosures, absent a reasonable opportunity for discovery. By demanding such specificity in the Motion, Defendant asks the Court to adopt a heightened pleading standard no NISNPIA plaintiff could ever satisfy, diminishing this important consumer protection statute and inoculating the company from liability under it in the process. This Court need not go along.[11] At this stage, Plaintiffs have pled a plausible claim, and Defendant has failed to establish within the FAC a statute of limitations defense that bars Plaintiffs claims. As such, the motion should be denied.

---

[10] Defendant's citation to *Robinson v. Morgan Stanley*, 2008 WL 4874459, at *5 (N.D. Ill. June 18, 2008) is inapposite. *Robinson*, a *pro se* plaintiff case, stands for the basic proposition that a pleading must provide notice of the essential facts of the claim such that a defendant may answer. *See id.* ("Because Robinson does not describe the speaker, the listener, or the timing of these statements, the Morgan Stanley Defendants are not in a position to properly file an answer in response to these allegations."). Here, Plaintiffs have amply explained Defendant's NISNPIA violative conduct and have put the Defendant on notice that Plaintiffs claim was based on disclosures which occurred during the statutory period.

[11] *See, e.g.*, *Zimmerman v. 3M Company*, 542 F. Supp. 3d 673, 681 (W.D. Mich. 2021) (Rule 8 pleading standard was satisfied in class action where named plaintiffs alleged that they were exposed to purportedly harmful chemical in drinking water, without alleging "whether any PFAS ha[d] been detected in their drinking water, and if so, how much"); *Rodriguez-Reyes v. Molina-Rodriguez,* 711 F.3d 49, 53-54 (1st Cir. 2013) (explaining that a complaint can survive a 12(b)(6) motion even if it does not "plead [all the] facts sufficient to establish a prima facie case" nor set forth "detailed factual allegations").

## IV. Plaintiffs have Article III Standing

Defendant asserts that Plaintiffs do not have Article III standing because Plaintiffs "have not suffered any actual, concrete injury, nor one that can be traced to DDM's alleged conduct." (Mot. at 15). However, Judge Parrish in *Curry II* addressed the identical argument with respect to NISNPIA and rejected it. *See Curry II*, 2024 WL 3794487, at *3-5. In *Curry II*, Judge Parrish recognized that disclosures identical to those alleged in this case harmed privacy interests well rooted in common law, and NISNPIA's passage reflects the determination of the Utah legislature to protect those interests from infringement. This Court should follow suit.

**Plaintiffs Have Clearly Alleged Tangible and Intangible Harm.** Defendant claims that Plaintiffs' injuries cannot satisfy Article III because they "are limited to (i) the receipt of 'a barrage of unwanted junk mail' and (2) the bare assertion of a statutory violation." (Mot. at 16).[12]

However, *Curry II* dispensed with the argument Defendant makes here: that well-pled NISNPIA violations are insufficient intangible harms to confer Article III standing. *Curry II*, 2024 WL 3794487, at *5. There, the court held that plaintiffs' allegations that defendant "'widely communicate[d]' their protected information, including to other parties themselves likely to further widely communicate it . . . reflect[ed] the sort of harm at issue in the tort of public disclosure" and thus gave the plaintiffs "standing to pursue their claims."[13] *Id*.

Examining *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) and *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) in the context of intangible harms, *Curry II* noted how "both history and the

---

[12] Although the disclosure-based harm alone is sufficient to establish standing, Plaintiffs also adequately allege tangible harm in the form of receipt of junk mail as a result of Defendant's illegal disclosures. (FAC ¶ 1). At this stage, "general factual allegations of injury" are sufficient. *See Kansas Nat. Resource Coalition v. U.S. Dept. of Interior*, 971 F.3d 1222, 1231 (10th Cir. 2020). Defendant also asserts that Plaintiffs' allegations of receipt of junk mail and its consequences are deficient because they do not include a specific causal connection between the disclosure and these intrusions. (Mot. at 16-17). Defendant ignores the specific words of the FAC: "[a]s a result." (FAC ¶ 1). There is nothing speculative or conclusory about Plaintiffs' allegations. Either alleged harm, standing alone, is sufficient to establish standing.

[13] Crucially, here, Plaintiffs allege that Defendant's disclosures of their nonpersonal public information was highly offensive to them and the average person. *See* FAC ¶¶ 84, 91, 110.

judgment of Congress play important roles" in determining whether an intangible harm constitutes an injury in fact, and indicated that "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at *3-5 (quoting *Spokeo*, 578 U.S. at 340-41). The court explained how *TransUnion* "recite[d] a few such traditional harms: 'reputational harms, disclosure of private information, and intrusion upon seclusion'" but also noted how "*TransUnion* . . . was also careful to emphasize that '[i]n looking to whether a plaintiff's asserted harm has a "close relationship" to a harm traditionally recognized as providing a basis for a suit in American courts, [courts] do not require an exact duplicate.'" *Curry II*, 2024 WL 3794487, at *3 (quoting *TransUnion*, 594 U.S. at 425, 433). Rather, "the harms must be similar in kind, not degree." *Id.* (quoting *Shields v. Prof'l Bureau of Collections of Md., Inc.*, 55 F.4th 823, 828 (10th Cir. 2022)).

Nonetheless, Defendant, as did the defendant in *Curry II*, argues that "the harm complained of was the failure to provide a disclosure, making the injury 'informational' by nature." *See id.* at *4; *cf., e.g.*, FAC ¶¶ 1–5, 7, 9–43, 80–87, 99–110, 112 (alleging far more than a so-called informational injury). However, the court in *Curry II* considered and rejected this argument, finding that such a description was not a "fair restatement of the harm addressed by NISNPIA." In so finding, Judge Parrish relied on the statute's "plain text, which frames the prohibited act as disclosure." *Curry II*, 2024 WL 3794487, at *4 (citing NISNPIA, Utah Code Ann. § 13-37-201(1)). Indeed, the operative provision states: "a commercial entity may not disclose nonpublic personal information[.]" *Id*. at *4. *Curry II* rejected Defendant's argument because the plaintiffs there, as here, alleged that the defendant "disclosed, without providing . . . the prior notice required by Utah Code § 13-37-201, Plaintiff[s'] . . . Private Purchase Information" to various third-party data companies. *Id.* The court found that "[b]ecause [NISNPIA] centers on the disclosure of information, plaintiffs' alleged harm is best compared to privacy torts such as public disclosure of private information and intrusion upon seclusion, rather than the conceptually distinct doctrine of informational injury." *Id.* The proper focus for Article III standing then, is the harm caused by Defendant's disclosures of Plaintiffs' nonpublic personal information to third parties. Such

conduct creates liability under the statute and infringes upon Plaintiffs' concrete, NISNPIA-conferred right to keep such information private.

*Transunion* lends further support. *Curry II*, 2024 WL 3794487, at *4 ("Unsurprisingly, courts around the country have determined that the disclosure of nonpublic personal information" described in *Transunion* "can provide the basis for Article III standing"). In *TransUnion*, the Court held that the dissemination of a misleading credit report constituted a concrete injury in fact under Article III. *TransUnion*, 594 U.S. at 432-33, 442. Here, Plaintiffs allege that Defendant sold their private personal information about purchases of consumer goods for profit to numerous third parties without prior notice, let alone consent. (FAC ¶¶ 9–43). *TransUnion* identified these types of disclosures as "chief example[s] of the sort of harm traditionally recognized as providing a basis for [a suit] in American courts." *Id.* at 425. The Tenth Circuit has applied *TransUnion* to hold that "disclosure of private information" and "intrusion upon seclusion" are examples of "concrete, intangible harms" that American courts have long recognized at common law and continue to manifest Article III standing. *Seale v. Peacock*, 32 F.4th 1011, 1020 (10th Cir. 2022). Plaintiffs allege they suffered these exact harms, as detailed further below. (*See* FAC ¶¶ 101-108, 110, 112).

Defendant's reliance on *Laufer v. Looper*, 22 F.4th 871 (10th Cir. 2022) in support of its argument is misplaced. *Laufer* did not involve an inquiry into whether the ADA claim had a common law analogue, which, like in *Curry*, should be the Court's focus of inquiry. It was undisputed that the plaintiff in *Laufer*, an ADA tester, only alleged as an injury "her discovery that the [defendant's reservation system] lacked certain information." *Id.* at 879. The plaintiff failed to link the harm from this lack of information to any harm well-rooted in common law torts. Consequently, *Laufer* is irrelevant to whether pled violations of NISNPIA are sufficient intangible harms to confer Article III standing.

Here, as detailed in *Curry II*, the harm resulting from a violation of NISNPIA is not about access to information, as was the sole allegation in *Laufer*, but the disclosure of private information and intrusion upon seclusion, without notice and without an opportunity for a person to avoid such actions. These are examples of "concrete, intangible harms" that American courts have long

recognized at common law and continue to manifest Article III standing. And these are precisely the harms Plaintiffs have alleged here.

**Public Disclosure of Private Information.** Defendant cites the Tenth Circuit's decision in *Shields*, to argue that disclosure of information to a third party cannot constitute an intrusion on privacy. (Mot. 19, n.11). But, as *Curry II* makes clear, *Shields* is inapposite. *Curry II*, 2024 WL 3794487, at *4-5. In *Shields*, the court rejected the plaintiff's argument that sharing a debtor's nonpublic information with a single third-party mailer was akin to a public disclosure of private information. *Id.* at *5 (noting that *Shields* involved "the disclosure of information to a single mail vendor whose role was limited to generating and sending a form letter").[14] Defendant misconstrues *Shields* to argue that it "makes clear that the 'publicity' required for the tort means conveyance to the public at large or so broadly that the information is essentially public knowledge." (Mot. n.11). As Judge Parrish stated in *Curry II*, *Shields* was "tasked with a simple line-drawing problem, and offered the obvious answer—disclosure of information to a single private party (one who carries no risk or prospect of further disclosure or circulation of the information) is not only not public enough, it is not public at all." Consequently, "*Shields* and related cases must be considered in this context, rather than as standing for the broader proposition that disclosure-based injuries cannot provide a basis for standing generally, as [defendant] suggests." *Curry II*, 2024 WL 3794487, at *5.

The harm Plaintiffs have alleged here, just like in *Curry II*, is "qualitatively different from the private disclosure discussed in *Shields* and related cases." *Curry II*, 2024 WL 3794487, at *5. Plaintiffs have alleged improper disclosure far beyond a single transfer to a private entity: the FAC alleges that Defendant "rented, sold, exchanged, and/or otherwise disclosed its customer lists containing Plaintiffs' Private Purchase Information . . . to third parties, including other consumer-facing companies, direct-mail advertisers" and other solicitors. (FAC ¶¶ 81, 103). These sweeping

---

[14] The plaintiff argued that the disclosure of her debt information to the mailer was akin to the tort of public disclosure, but the court found the disclosure of nonpublic information to a private party middleman did not reflect the sort of harm protected by that tort. *Shields*, 55 F.4th at 829.

disclosures easily satisfy the definition of "*public* disclosure of private facts, which is concerned with highly offensive information being widely known." *Shields*, 55 F. 4th at 829 (citing Restatement (Second) of Torts § 652D cmt (Am. L. Inst. 1977)). Plaintiffs further allege that Defendant offered to sell their nonpublic personal information on the open market to anyone willing to purchase it and that Defendant sold such information numerous times to numerous third parties. And finally, as in *Curry II*, Plaintiffs "allege that [defendant] markets their information openly, selling it to any buyer who is willing to pay[,]" disclosing "nonpublic personal information" to third parties "likely to further widely communicate it." 2024 WL 3794487, at *5 (citing *Shields*, 55 F.4th at 829).

Defendant's widespread disclosures of Plaintiffs' nonpublic personal information to anyone interested in purchasing it (not just disclosure to a single vendor as in *Shields*) are plainly analogous to the common law tort of disclosure of private information and thus readily satisfy Article III's concreteness test. *Curry II*, 2024 WL 3794487, at *5; *see also Bohnak v. Marsh & McLennan Co.*, 79 F.4th 276, 285-86 (2d Cir. 2023) (disclosure of personal information "to unauthorized third parties," rather than to the public, has the requisite "close relationship" to the tort of public disclosure of private facts, with the court noting that it did not "stretch to reach this conclusion," because "the intangible harm arising from disclosure of one's [personal information] bears a relationship to an injury with a close historical or common-law analogue," even if it is not "an exact duplicate"). Ultimately, formulating the precise degree of publicity under the common-law tort of public disclosure is unnecessary. *See Curry II*, 2024 WL 3794487, at *5 ("While this again invites the question of just how public is public enough to bear a close relationship with harm protected by the comparator tort of public disclosure, the court is satisfied that, wherever that line is, the plaintiffs here have crossed it."); *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019) ("Our inquiry is focused on types of harms protected at common law, not the precise point at which those harms become actionable.").

In enacting NISNPIA, the Utah legislature sought to protect the rights of consumers to keep nonpublic personal information private. NISNPIA codified a concrete privacy right to prevent

unauthorized and uninformed disclosures of such information and protect against intrusions into a person's personal preferences and purchasing habits. *See* Utah Code § 13-37-201 & § 13-37-102 (prohibiting commercial entities from disclosing any person's "nonpublic personal information" obtained as a result of the person's purchase of consumer goods from the company, unless the person was first noticed as specified in section 13-37-201, before transacting with the company). Many courts have found Article III standing exists to redress unauthorized disclosures of personal information in violation of other personal privacy acts, confirming the concreteness of the injuries alleged by Plaintiffs here. *See e.g.*, *Perry v. Cable News Network, Inc*., 854 F.3d 1336 (11th Cir. 2017); *In re Nickelodeon Consumer Privacy Litig*., 827 F.3d 262, 274 (3d Cir. 2016); *Yershov v. Gannet Satellite Info. Network, Inc.*, 240 F. Supp. 3d 353, 361 (D. Mass. 2016).

**Intrusion Upon Seclusion.** The harms alleged here are also akin to those covered by the traditional tort of intrusion upon seclusion. "Intrusion upon seclusion occurs when an individual 'intentionally intrudes, physically or otherwise, upon the solicitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person.'" *Salazar v. Nat'l Basketball Ass'n*, 685 F. Supp. 3d 232, 241 (S.D.N.Y. 2023) (quoting Restatement (Second) of Torts § 652B (1977)). Notably, an intrusion upon seclusion "does not depend upon any publicity given to the person whose interest is invaded or to his affairs." *Scott v. Hern*, 216 F.3d 897, 917 (10th Cir. 2000). As an example of the injury, the Restatement (Second) highlights that an intrusion into someone's privacy includes opening one's private mail. Restatement (Second) of Torts § 652B, cmt.b. "The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the . . . information outlined." *Id.*

Defendant argues, though, that Plaintiffs' claims lack a common law analogue. (Mot. 20–21). However, following *TransUnion*, courts have had little difficulty finding common law analogues to the tort of intrusion upon seclusion for purposes of satisfying Article III.[15]

---

[15] *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191 (10th Cir. 2021) ("At common law, courts readily recognized a concrete injury arising from the tort of intrusion upon seclusion – a tort protecting against defendants who intrude into the private solitude of another"); *Feldman v. Star Trib. Media*

Plaintiffs adequately allege that Defendant's improper disclosures "intruded substantially upon [their] solitude and seclusion (including the personal affairs and concerns)" "in a way that was highly offensive to Plaintiff[s] and would be highly offensive to a reasonable person[.]" (FAC ¶ 84). *See, e.g.*, *Salazar*, 685 F. Supp. 3d 241 (finding the same based upon factual allegations similar to those found in the FAC) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)) (finding "general factual allegations of injury resulting from the defendant's conduct may suffice" at the pleading stage). The FAC contains allegations concerning Defendant's disclosure practices from which it may be reasonably inferred that Defendant's disclosures of Plaintiffs' nonpublic personal information to third parties for compensation were intrusive of Plaintiffs' private affairs or concerns (e.g., "purchasing habits" and "personal preferences") and that those disclosures would be highly offensive to a reasonable person (e.g., FAC ¶¶ 84, 91, 110). The determination of whether these disclosures would be considered highly offensive to a reasonable person is plainly an issue of fact suitable for a summary judgment motion, not a motion to dismiss. The Motion's standing challenge should be denied.

## V. Rule 23 Preempts NISNPIA's Class Action Bar

Section 203(3) of the NISNPIA provides that "a person may not bring a class action under this chapter." Utah Code § 13-37-203(3). Under *Shady Grove*, state law class action bars like the one in NISNPIA are preempted before federal courts sitting in diversity unless preemption would abridge, enlarge, or modify state law rights or remedies. *Id.*

Defendant directs its argument to Step Two of *Shady Grove* by arguing NISNPIA's class action bar applies here and that, consequently, the court lacks subject matter jurisdiction based on NISNPIA's specific limitation on a consumer's "substantive right to sue for a violation of that statute and that statute alone" and the location of the statutory remedy in the liability section of the statute. (Mot. at 21-22) In a well-reasoned and nuanced decision in *Curry*, Judge Parrish

---

*Co. LLC*, 659 F.Supp.3d 1056 (D. Minn. 2023) (disclosures of private video viewing history with Facebook found analogous to the tort of intrusion of seclusion).

considered the same arguments and authorities cited in support by Defendant here and determined that Rule 23 preempts NISNPIA's class action bar and that NISNPIA actions like this one are cognizable as class actions in federal courts. This Court should follow suit.

In *Shady Grove*, Justice Stevens, in concurrence, set forth a two-step analysis to evaluate the preemption of a New York statutory provision restricting class actions in a diversity action in federal court.[16] Step one considers whether the applicable Federal Rule of Civil Procedure – here Rule 23 – and the state rule at issue – here Section 203(3)'s class action bar – are "reconcilable," *Stender v. Archstone-Smith Operating Tr.*, 958 F.3d 938, 947 (10th Cir. 2020), or, stated differently, whether the federal rule and state statue are in "direct collision." *Shady Grove*, 559 U.S. at 421. Step two considers whether there is a direct collision between the federal procedural rule and the state statutory provision, and if so, would application of the federal procedural rule pose a Rules Enabling Act problem: would that rule "effectively abridge[], enlarge[], or modif[y] a state-created right or remedy." *Id.* at 422. Justice Stevens explicitly recognized that, as to this second step, "the bar for finding an Enabling Act problem is a high one" and reiterated that "[t]he mere possibility that a federal rule would alter a state-created right is not sufficient. There must be little doubt. . . [S]ome effect on the outcome of litigation" is not enough. *Id.* at 432-33.

Judge Parrish's analysis of *Shady Grove*'s second step recognized that the inquiry looks "to the state statute at issue to differentiate between rights and remedies on the one hand, and procedures on the other, to ensure that Rule 23 does not overstep the boundaries of the Rules Enabling Act or interfere with states' ability to determine the 'dimensions' of a state-created claim." *Curry*, 2023 WL 6318108, at *6 (citing *Shady Grove*, 559 U.S. at 429 (Stevens, J. concurring)). Judge Parrish's second step analysis was purely textual and is as follows:

> This issue can be resolved by reference to the relevant statutory "text and context" alone. Utah's NISNPIA, including § 203, labeled "Liability," at issue here, is cleanly divisible into rights, remedies, and procedures. Surgical removal of the

---

[16] The Tenth Circuit has held that Justice Stevens' *Shady Grove* concurrence is controlling. *Garman v. Campbell Cty. Sch. Dist. No. 1*, 630 F.3d 977, 985 (10th Cir. 2010).

presumptively procedural class-action bar leaves the rights and remedies otherwise provided by the Act totally intact.

In fact, § 203 itself is comprised of three subsections that neatly track these three categories: the first defines the dimensions of the claim and cause of action; the second defines the remedies available to litigants under the Act; and the third, of particular concern in this case, is a matter of procedure. At one greater degree of detail, § 203 is mapped out as follows: § 203(1), together with §§ 201 and 202, including by reference to definitions provided under § 102, provide the *cause of action*—that is, the claim or right. Section 203(1)(a)-(c) thereby outlines the "operative group of facts" that must be pleaded in order to give rise to a basis for suing, *Cause of Action*, BLACK'S LAW DICTIONARY (11th ed. 2019), and thus "defines the dimensions of [the] state-created claim."

Section 203(2), in turn, creates the applicable remedy by defining what "a court can do for a litigant who has been wronged," *Remedy*, Black's Law Dictionary (11th ed. 2019), by creating liability for violating commercial entities amounting to $500 "for each time the commercial entity fails to provide the notice required by this section in relation to the nonpublic personal information of the person who brings the action," along with court costs. UTAH CODE ANN. 13-37-203(2)(a)-(b).

Section 203(3), however, is neither a statement of rights nor one of remedies. It neither dictates what must be pleaded or proved as a cause of action, nor does it determine what a plaintiff *gets* should he prevail on such a claim. Instead, § 203(3) is entirely a matter of procedure, merely going to the preferred means of joinder and aggregation: "a classically procedural calibration of making it easier to litigate claims in [Utah] courts . . . only when it is necessary to do so, and not making it too easy when the class tool is not required." Utah has calibrated the ease of aggregating claims under NISNPIA one way through regulation of its state courts under the Act, and Congress has elected another calibration through Rule 23 in the government of federal courts. In both cases, however, the class action remains a quintessentially procedural claims-processing device and, in the specific case of NISNPIA, is separable from any elements of Utah's "framework of substantive rights and remedies," otherwise provided under that Act. […]

[T]he availability of the procedural mechanism of the class action has "some effect on the outcome of litigation," … Given the feasibility of disentangling the procedural class-action bar from the rest of the Utah statute, while leaving the rights and remedies provided therein intact, this court finds that the "high" bar of finding a Rules Enabling Act violation has not been cleared.

*Curry*, 2023 WL 6318108, at *6.

Defendant cursorily addresses *Curry*'s reasoning in a footnote arguing "that the statute's class-action bar could be 'removed' from the statute while leaving its rights and remedies 'intact'"

is not an answer to the dispositive question of whether judicial removal of the prohibition would substantively expand the scope of the statute's rights and remedies." (Mot. at 24 n.13) This argument fails along with Defendant's inapplicable analysis of other clearly distinguishable consumer protection laws. (Mot. at 23) Other federal courts confronted with the same issue in the context of analogous statutory schemes have consistently reached the same conclusion as Judge Parrish.[17]

The force of Judge Parrish's reasoning is undeniable. Indeed, if 5,000 members of a potential class action were all entitled to statutory damages under Section 113-37-203, the scope of Defendant's liability would not be changed if the actions were brought individually instead of in a class action. Section 203 is plainly a severable claims processing rule applicable in Utah state court but with no effect before this Court. *Curry* parses the statute's text to answer the fundamental question of whether Section 203(3)'s class action bar is a procedural rule or a substantive component of rights and remedies under the statute. It is procedural, and other cases are in accord.[18] There is simply no reason to conclude that the decision to include a class action bar reflected a

---

[17] *See, e.g., Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1336 (11th Cir. 2015) ("how a state chooses to organize its statutes affects the analysis not at all…the question whether a federal rule abridges, enlarges, or modifies a substantive right turns on matters of substance— not on the placement of a statute within a state code."); *Roberts v. C.R. England*, 321 F. Supp. 3d 1251, 1258-59 (D. Utah 2018) (explaining that "[t]he location of a law within state statutory codes can be useful in discerning the legislature's intent, but cannot in itself prove the law's procedural or substantive nature," especially "considering Justice Stevens's merely passing mention of the New York statute's location in the state code"); *Smith-Brown v. Ulta Beauty, Inc.*, 2019 WL 932022 at *13-14 (N.D. Ill. Feb. 26, 2019) (unpublished) (citing *Lisk*, 792 F.3d at 1336); *Payne v. Tri-State CareFlight, LLC*, 328 F.R.D. 601, 644 (D.N.M. 2018) (citing *Roberts*, 321 F. Supp. 3d at 1258); *Gandy v. RWLS, LLC*, 308 F. Supp. 3d 1220, 1229 (D.N.M. 2018) (also citing *Roberts*).

[18] *See, e.g., In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 355 F. Supp. 3d 145, 156 (E.D.N.Y. 2018) ("Here, Hawaii's law regulates only when private plaintiffs can litigate the case. It does not alter the substantive elements of plaintiffs' claims. Most importantly, it is surely no more substantive than the statute at issue in *Shady Grove*, which barred class action suits for an entire category of claims."); *Los Lobos Renewable Power, LLC v. Americulture, Inc*, 885 F.3d 659, 670 (10th Cir. 2018) quoting *Shady Grove*, 559 U.S. at 408 (Scalia, J., plurality opinion) ("The New Mexico [anti-SLAPP] statute does not alter the rules of decision by which a court will adjudicate the merits of the complaint. The statute "alter[s] only how the claims are processed.").

legislative judgment on the scope of the rights or remedies conferred under the statute, much less sufficient justification to clear the high hurdle of finding a Rules Enabling Act problem. Defendant offers no good reason for why the Court should find otherwise, and accordingly, the Motion should be denied.

### VI.     There is no basis for the Court to refuse jurisdiction on comity grounds

As a Hail Mary, Defendant presses "federalism and comity" as grounds for this Court to decline to hear this case. (Mot. at 25). A similar comity argument was rejected in *Dutcher v. Matheson*, 840 F.3d 1183, 1195 (10th Cir. 2016) and should be here as well. In *Dutcher*, the court stated that where a case involves neither "a state tax administrative scheme nor a risk to Utah's ability to collect taxation" comity is immaterial. *See id.* (citing *Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010)). As such, *Dutcher* underscores that "comity" is not a procedural trump card for defendants, who, for one reason or another, do not like the federal forum. Rather, federal courts decline jurisdiction based on comity only rarely, *Thompson v. Ashner*, 601 F. Supp. 471, 473 (N.D. Ill. 1985), and when they do, it is only in cases where the dispute involves a state's taxation mechanisms, *e.g., Levin*, 560 U.S. at 413 (2010), a comprehensive regulatory regime the state has determined should be administered locally, *e.g. Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943), or where resolution of an unclear and difficult issue of state law might moot a federal constitutional issue, *e.g., Railroad Comm'n of Texas v. Pullman*, 312 U.S. 496 (1941).

This case involves none of these. As Judge Parrish found in *Curry*, this case does not implicate Utah's framework of substantive rights at all, 2023 WL 6318108, at *7 (D. Utah Sept. 28, 2023), much less a policy choice that impacts federal-state relations. *See Younger v. Harris*, 401 U.S. 37, 44 (1971). Rule 23 preemption is a simple issue of federal courts have elected to process claims under the Federal Rules of Civil Procedure. There is no good reason based on comity or federalism for the Court to decline jurisdiction over this case.

### CONCLUSION

Based on the above, Defendant's Motion to Dismiss should be denied in its entirety.

Dated: October 4, 2024                    Respectfully submitted,

                                                    **HEDIN LLP**

                                                    /s/ Frank S. Hedin (*Pro Hac Vice*)
                                                    FRANK S. HEDIN

                                                    *Counsel for Plaintiffs and Putative Class*